STATE, RESPONDENT, *v.* SPOTTED HAWK, APPELLANT.

[No. 1299.]

[Submitted January 4, 1899.   Decided January 23, 1899.]

*Information—Leave to File—Crimes Committed by Indians—
Jurisdiction of State Courts—Trial—Change of Venue in
Capital Case—Corroboration of Accomplice—Witnesses—
Impeachment—Alibi—Homicide—Instructions.*

|    |     |
|----|-----|
| 22 | 33  |
| †22 | 426 |
| 22 | 429 |
| 22 | 33  |
| 23 | 535 |
| 22 | 33  |
| 29 | 276 |
| 22 | 33  |
| †31 | 370 |
| 22 | 33  |
| 33 | 496 |
| 22 | 33  |
| †36 | 253 |

INFORMATION—*Leave to File*—1.—Under Constitution Art. III, Sec. 8, providing that prosecutions in the District Court must be by information filed after the examination and commitment before a magistrate, or on leave of court, an information may be filed with leave of court, without a previous commitment of accused by a magistrate. An information need not show on its face that it was filed with leave of court.

An information filed with leave of court will not be set aside because prior thereto accused had been arrested before a magistrate, and thereafter the proceedings against him before the magistrate had been abandoned.

*Semble.*—An application for leave to file an information need not conform strictly to the technical rules of pleading.

SAME—*Crimes Committed by Indians*—2.—Since a District Court has general jurisdiction of all felonies committed within the limits of the county where it sits, an indictment against an Indian for murdering a white man in a certain county need not show that the crime was not committed within the limits of any Indian reservation.

An information charging the commission of an offense in a county in which there is a United States military reservation need not show that the crime was not committed on such reservation, because, if the court be without jurisdiction, the question may be raised at the trial.

JURISDICTION OF STATE COURTS—3.—State courts have jurisdiction of crimes committed against whites, outside of an Indian reservation, by Indians maintaining tribal relations on a reservation within the state, in charge of the Federal Government.

TRIAL—*Absence of Accused during*—4.—After the reconvening of court after a recess, a witness for the State was asked one question while accused was absent, but, before he answered it, the court stopped proceedings until accused was brought in. *Held,* that accused was not prejudiced.

Accused need not be present in court during the argument of a demurrer to the information, or while a motion to set the information aside is being disposed of, such proceedings being no part of the "trial."

CHANGE OF VENUE—5.—An application for a change of venue must set forth the facts upon which it is based, and not the mere opinion of the affiants, or witnesses who are sworn in support of it; and every application must be determined upon the facts and circumstances presented by it.

On an application for a change of venue in a prosecution for homicide, accused deposed that the people of all parts of the county were greatly excited; that 200 armed cowboys and ranchmen had gathered at a ranch near the Indian agency on which accused, an Indian, was, their object being to force the Indian agent to surrender the murderer, who, they claimed, was a member of the tribe; if not surrendered, it was their intention to exterminate the tribe, and, to this end, they had gathered ammunition and rifles from distant cities, and were only persuaded from attacking the Indians by the civil authorities of the county; that the sheriff was compelled to leave deputies in charge of them; that, at the time of the burial of deceased, a large number of men took an oath that they would be present at the trial of his murderers,

and, if they were acquitted, they would not be allowed to leave the court room; that the military authorities sent soldiers to the reservation to prevent an outbreak; that the papers of the county of general circulation denounced the Indians, including defendant, and about forty families moved away from the agency to a distant town, to get protection from threatened danger, and remained away several weeks. This showing was contradicted by an affidavit on information and belief, and by the sheriff, who denied that he put deputies in charge of the cowboys and ranchmen, but admitted that he had placed deputies from different parts of the county near the agency, to warn the people of any coming danger. Another witness deposed to excitements in all parts of the county, and that there was strong prejudice in the minds of the people, who were ready to commence an open movement against the Indians if further trouble occurred. *Held*, an abuse of discretion to refuse the application.

The fact that a jury, answering all statutory requirements, was obtained after examining only 65 venire men, is not conclusive on the question of the existence of such a prejudice in that county as to render a fair and impartial trial impossible.

CORROBORATION OF ACCOMPLICE—6.—Under Penal Code, Section 2089 (requiring an accomplice to be corroborated by independent evidence tending to connect accused with the crime), evidence that witness saw accused and an accomplice steal a cow, and, while in the act of committing the larceny, they were seen by a white man; that accused was seen in company of the accomplices, armed and riding horses, at about the time that deceased disappeared; that four weeks later a white man was found on the range, shot in the arm and breast; near the body were found three empty shells, and tracks of three horses, and a dead dog; and that accused asked witness "not to tell it," pointing in a direction not disclosed—is an insufficient corroboration of an accomplice's testimony that he and accused, having been discovered stealing a cow by a white man, followed him, and killed him and his dog, placing the two bodies together, where the only identification of the locality is that it was on the same stream, the country being unsettled cattle country.

WITNESSES—*Impeachment of*—7.—Under Code of Civil Procedure, Section 3380, a sufficient foundation is laid for the impeachment of a witness by asking him whether he did not, in a certain conversation, at a certain place, make statements to which his attention is then called.

SAME—*Same*—8.—On cross-examination of a witness, a question whether he was not discharged from the army because of periodical insanity and general imbecility is properly disallowed, since it does not tend to bring out the fact of his mental condition, but merely the opinion of others on that subject.

A certificate of the War Department showing that a witness was discharged from the army because of mental imbecility is incompetent to discredit his testimony, being an *ex parte* statement by a person not shown to be qualified to pass on the matter.

It is incompetent, as being an attempt to impeach the witness on an immaterial matter.

*Obiter*.—It is certainly within the sound discretion of the court to allow leading questions on the part of the county attorney, especially when the witnesses are illiterate and unable to speak English; but having done this, it is but fair to extend the same privilege to the defendant.

INSTRUCTIONS—*Accomplice—Alibi*—9.—An instruction that a certain witness was an accomplice, and, on the testimony of an accomplice or one jointly charged with accused, there cannot be a conviction, unless the jury be satisfied of its truth, and can rely on it, is erroneous, as assuming that one jointly charged with accused is an accomplice.

The fact that a witness is charged with the same offense jointly with accused does not of itself make him an accomplice.

One accomplice cannot corroborate the testimony of another accomplice.

An instruction that an alibi is a proper defense if proven, and if, in view of all the evidence, the jury have a reasonable doubt as to the presence of accused at the time and place of the commission of the crime, they should give defendant the benefit of the doubt, and find him not guilty of the commission of the crime, is not erroneous, as requiring defendant to establish his alibi, it merely requiring him to furnish proof tending to establish it.

SAME —"*Preconceive*"—"*Premeditation*"—"*Deliberation*"—10. — In a prosecution for

homicide, an instruction that "preconceive" means to think of before the execution of the act, and hence means premeditation, which is thought beforehand for any length of time, however short, and that "deliberation" does not mean brooded over or reflected on for a week, but means the intent to kill executed by one not under the influence of a violent and sudden passion, but in the furtherance of a formed design; that is, "it means in a cool state of blood, and is usually characterized by what are ordinarily termed "cold-blooded murders," such as proceed from deep malignity of heart—*Held*, not reversible error.

*Appeal from District Court, Custer County; C. H. Loud, Judge.*

YELLOW HAIR, Spotted Hawk and others were indicted for murder. Spotted Hawk was convicted, and he appeals. Reversed.

The statement of facts appears in the opinion.

*Merrill & Farr* and *Sanders & Sanders*, for Appellant.

The appellant contends that the information filed in this cause does not state facts sufficient to show jurisdiction of the trial court. (Act of Congress of March 3, 1885; 1 Chittenden on Criminal Law, 131; *McBride* v. *State*, 10 Humph. (Tenn.) 615; 1 Bishop on Criminal Procedure, Sec. 375; *People* v. *Wong Wang*, 92 Cal. 277, 28 Pac. 270.) Appellant assigns as error the overruling of his challenge for actual bias to jurors. (Subdivision 2, Sec. 2048, Penal Code; Sec. 2051, Penal Code; *State* v. *Lattin*, decided by the Supreme Court of the State of Washington, and reported in the 52 Pac. Rep. 314; Sec. 3123, Code of Civil Procedure.) The appellant contends that the evidence is insufficient to convict for the reason that the testimony given by Whirlwind, alias David Stanley, who is a self-confessed accomplice, is not corroborated by any other testimony tending to connect the appellant with the crime committed. (Wharton on Criminal Evidence, Sec. 442; *People* v. *Thompson*, 50 Cal. 480.) We believe that the refusal to give the instructions as requested was prejudicial error. (*People* v. *Cregans*, 53 Pac. 1082; Sec. 3390, Code of Civil Procedure; *People* v. *Strybe*, 36 Pac. 3; *State* v. *Myers*, (Wash.) 35 Pac. 580.) The verdict in this case is

contrary to law in this: that the venue as laid in the information was not proved on the trial. (*People* v. *Wong Wang*, 28 Pac. Rep. 270, 92 Cal. 277, and *People* v. *Ah Ung*, 28 Pac. Rep. 272; *People* v. *Roach*, 48 Cal. 382; *Grusenmeycr* v. *Logansport*, 76 Ind. 549; *Goodwin* v. *Appleton*, 22 Me. 453; *Russel* v. *Hoyt*, 4 Mont. 412.) The burden of proof does not shift in criminal cases, and the averment being material as showing the jurisdiction of the trial court must be proved. (*Phillips* v. *State*, 26 Tex. App. 228, s. c., 8 Am. St. Rep. 471; *Black* v. *State*, 1 Tex. App. 368; *Jones* v. *State*, 13 Tex. App. 1; *Taylor* v. *State*, 13 Tex. App. 184.)

The different occasions upon which the defendant was absent during the trial, are particularly set out in his affidavit, in support of the motion. (See record supplied by order of October 24th, 1898.) Briefly stated these occasions are as follows: That the defendant was not present during the hearing by the court of the arguments upon his demurrer to the information filed in this cause which was both heard and ruled upon by the court, during the enforced absence of the defendant. See defendant's bill of exceptions to the ruling of the court. (Transcript p. 9). The defendant was not present during the hearing by the court, of the arguments by the counsel upon his motion to quash the information filed against him, which motion was argued 'and passed upon by the court during the enforced absence of the defendant. (See defendant's bill of exceptions to the ruling, trans. p. 12). The defendant was not present in court when a witness was called and his examination begun. (See trans. p. 198).

Chapter 1, part two, of the Penal Code defining the rights of the defendant, provides as follows:

Sec. 1352. The proceedings by which a party charged with a public offense is accused and brought to trial and punishment is known as a criminal action.

Sec. 1355. In all criminal prosecutions the accused shall have the right: To appear and defend in person and by counsel.

Sec. 1992 provides: That the defendant must be personally present at the trial.

That these sections apply to and should govern the whole trial seems to us to be beyond doubt. The defendant has the right to appear and defend in person, whenever anything essential is done against him. (Bishop on Criminal Procedure, Vol. 1, Sec. 265). The reason of the rule would seem to apply as much to the hearing upon the demurrer or motion to quash as to any other time of the trial. The statute reasons that a criminal prosecution is a proceeding by which a party charged with a public offense is brought to trial, and that in a criminal prosecution the accused shall have the right to appear and defend in person and by counsel.

Sec. 1031, Code of Civil Procedure: "An issue of law arises upon a demurrer to the complaint, answer or reply, or to some part thereof" and certainly the statute contemplates that the defendant shall be personally present when any of these proceedings are had.

Sec. 1921, Code of Civil Procedure, reads: "Both the demurrer and plea must be put in, in open court, either at the time of arraignment or at such other time as may be allowed to the defendant for that purpose." How can the defendant be consulted in these matters, if he is not present? Does the statute contemplate that he shall be notified of the formal disposition of these matters? It would hardly seem so when he is expressly guaranteed the right to appear and defend in person or by counsel. The same reasons are equally applicable to the appearance of the defendant during the hearing of the motion to quash the information.

Sec. 1912 of the Penal Code reads: "The motion must be heard at the time it is made, unless for cause, the court postpones the hearing to another time. If the motion is denied, the defendant must immediately answer the indictment or information." How can the defendant do this if he is not present as is his right? (*People* v. *Kohler*, 5 Cal. 72; *People* v. *Higgins*, 59 Cal. 357; *People* v. *Harrington*, 42 Cal. 168; *State* v. *Clifton*, 46 Pac. 715; *Territory* v. *Day*, 37 Pac. 806.)

The statute does not seem to single out any particular part of the trial, during which the defendant must be present, and

unquestionably refers to the whole trial. The motion to quash is based upon the affidavit of the defendant and the issue joining is both of the law and fact. In *State* v. *Clifton,* 57 Kan. 448, s. c., 46 Pac. 715, the court held that a hearing upon a motion to quash an information for felony is a part of the trial, during which defendant must be personally present. (*Hopt* v. *Utah,* 110 U. S., 574; *State* v *Hughes,* 2 Ala. 102; s. c., 36 Am. Dec. 411; *Cook* v. *State,* 60 Ala. 39; s. c., 31 Am. Rep. 31; *Ex parte Bryan,* 44 Ala. 402; *Bearden* v. *State,* 44 Ark. 331; *Sweeden* v. *State,* 19 Ark. 205; *State* v. *Hurlbut,* 1 Root (Conn.) 90; *Gladden* v. *State,* 12 Fla. 562; *Holton* v. *State,* 2 Fla. 476-500; *Nolan* v. *State,* 55 Ga. 521; s. c., 21 Am. Rep. 281; *Brooks* v. *People,* 88 Ill. 327; *State* v. *Myrick,* 38 Kan. 238; *State* v. *Muir,* 32 Kan. 481; *State* v. *Moran,* 46 Kan. 318; *Allen* v. *Com ,* 86 Ky. 642; *State* v. *Davenport,* 33 La. Ann. 231; *State* v. *Cross,* 27 Mo. 332; *State* v. *Smith,* 90 Mo. 37, 59 Am. Rep. 4; *Scaggs* v. *State,* 8 Smedes & M. (Miss.) 722; *Dyson* v. *State,* 26 Miss. 362; *Stubbs* v. *State,* 49 Miss. 716; *Rolls* v. *State,* 52 Miss. 391; *Maurer* v. *People,* 43 N. Y. 1; *State* v. *Jenkins,* 84 N. C. 812, s. c. 37 Am. Rep. 643; *Jones* v. *State,* 26 Ohio St. 209; *Rose* v. *State,* 20 Ohio, 31; *Dougherty* v. *Com.,* 69 Pa. St. 286; *Dunn* v. *Com.,* 6 Pa. St. 384; *Hutchinson* v. *State,* (3 Coldw.) 43 Tenn. 95; *Andrews* v. *State,* (2 Sneed) 34 Tenn. 550; *Witt* v. *State,* (5 Coldw.) 45 Tenn. 11-15; *State* v. *Jones,* (2 Yerg.) 10 Tenn. 22; *Brown* v. *State,* 38 Tex. 482; *Mapes* v. *State,* 13 Tex. App. 85; *Gordon* v. *State,* 13 Tex. App. 196; *Sperry* v. *Com.* 9 Leigh (Va.) 623, s. c., 33 Am. Dec. 261; *Hooker* v. *Com.* 13 Gratt. (Va.) 763; *Lawrence* v. *Com.* 30 Gratt. (Va.) 845; *Jackson* v. *Com.* 19 Gratt. (Va.) 656; *State* v. *Sutfin,* 22 W. Va. 771.)

*C. B. Nolan,* Attorney General, and *T. J. Porter* for the State.

The motion for a change of venue is based principally upon the affidavit of the defendant. This affidavit states that he could not have a fair and impartial trial because the people of

Custer county are prejudiced against the tribe of Indians of which the defendant is a member.  The defendant does not state from what source he has learned any facts bearing upon this matter, or that he is in his own knowledge possessed of any facts justifying this belief, and the defendant's affidavit is not supported by the affidavit of any person whomsoever, not even the affidavit of his own attorney showing that any effort was made on their part to secure information or knowledge upon this subject, or even to secure affidavits, or other evidence, in support of the grounds alleged against the people of the county.  Such an affidavit, we submit, is wholly insufficient to show good cause for a change of venue.  ''An affidavit against a whole community, that states the mere conclusions of the witness, is of no consequence whatever.''  (*Kennon* v. *Gilmer*, 5 Mont. 262; *People* v. *Shuler*, 28 Cal. 490.) The defendant's affidavit wholly fails to show any acquaintance with the condition of the people throughout the whole county, or to state any facts which would justify the granting of a change of venue in the exercise of a sound judicial discretion.  So far as the oral testimony that was submitted upon the hearing of this motion is concerned, it does not touch the people of the whole county, but on the contrary is confined to the immediate locality of the murder in and around the Cheyenne Reservation.  Now even if a large proportion of the people living in the immediate vicinity of the place where the crime was committed have become familiar with the facts, and have formed opinions either hostile to or favorable to the defendant, this does not constitute a good cause for a change of venue.  (*State* v. *Russell,* 13 Mont. 166.)

The court below, after hearing all the evidence offered, found there was no sufficient showing of a good cause for a change of venue, and there is nothing in the record here presented to justify the contention that this finding was an abuse of a sound judicial discretion.  (*Territory* v. *Manton*, 8 Mont. 103.)  It is further insisted by the appellant upon the motion for a change of venue, that the motion should have been granted because of certain newspaper clippings published in

Custer county and elsewhere, containing what purported to be the facts as to the killing of Hoover. A similar position was taken by the defendant in the case of *Territory* v. *Corbett*, 3 Mont. 50. (See also *State* v. *Edgerton*, 69 N. W. 280; *Muscoe* v. *Commonwealth*, 87 Va. 460; *Hickam* v. *People*, 137 Ill. 75; *State* v. *Barton.* 8 Mo. App. 15; *State* v. *Rhea*, 25 Kan. 576.) Challenges were interposed by appellant to the jurors, Thompson, Twombly and Fessler, on the ground of actual bias, and exceptions were attempted to be taken to the action of the court in overruling these challenges. It is submitted, however, that the action of the court in this respect in not properly before this court, and cannot be reviewed. (Section 2170, Penal Code.) Under this section it will be observed that it is only to the admission or rejection of testimony on the trial of a challenge to a juror for actual bias, that an exception may be taken by the defendant. The issue of fact as to whether these jurors were or were not in such condition of mind as to disqualify them, having been determined by the court, its action upon that issue was final, as no exception was taken to any ruling of the court in admitting or rejecting evidence. This has been repeatedly held in California, from which state Section 2170 was undoubtedly taken. (Sec. 1170 Penal Code of California; *People* v. *Taing*, 53 Cal. 602; *People* v. *Vasquiez*, 49 Cal. 560; *People* v. *Cotta*, *id.* 166; *People* v. *Wong Ark*, 96 Cal. 125; *People* v. *Boling*, 83 Cal. 380; *People* v. *Riley*, 65 Cal. 107; see also, *State* v. *Mims*, 26 Minn. 183; *People* v. *Bodine*, 1 Denio 308; *Sanchez* v. *People*, 22 N. Y. 147; *Stout* v. *People*, 4 Parker's Crim. Rep (N. Y.) 132; *State* v. *Wincroft*, 76 N. C. 38; *State* v. *Sheerin*, 12 Mont. 539; *Territory* v. *Bryson*, 9 Mont. 32; *Shields* v. *State*, 95 Ind. 299; *Balbo* v. *People*, 80 N. Y. 484; *Maretek* v. *Cauldwell*, 2 Abb. Pr. (N. S.) 407.) It was entirely competent for the County Attorney to show, on redirect examination of the witness, that they had not asked him to make any statement that was not in fact true. (*People* v. *Mills*, 94 Mich. 630.) There was no error in excluding the opinion of the witness. (*State* v. *Fon-*

*tenot*, 23 So. 634.) Objections to several questions asked of witnesses by counsel for the defendant, on direct examination, were sustained on the ground that they were leading. It is always a discretionary matter with the court, and the power to vary the general rule should be exercised only so far as the purposes of justice plainly require it, and should be regulated by the circumstance of each case. (*Hoody* v. *Rowell*, 17 Pick. 498; *Donell* v. *Jones*, 13 Ala. 490.)

Counsel for appellant attacks the sufficiency of the evidence to warrant the conviction of the defendant upon the ground that the testimony of Whirlwind, co-defendant, is not corroborated by any other testimony tending to connect the appellant with the crime. Under the statutes of this State corroborating testimony must in itself tend to connect the defendant with the commission of the offense. So far as we know this statute has not recently been under consideration in this Court, but it is in terms similar to the statute in force in 1878, when the matter was considered in *Territory* v. *Corbett*, 3 Mont. 59, and it is there stated that an accomplice need not be corroborated on every item of testimony given by him. (*Territory* v. *Mahaffey*, 3 Mont. 116; *Malachi* v. *The State*, 89 Ala. 140; note to Sec. 4476 of the Code of 1886; 1 Greenleaf Ev. Secs. 34-35 and notes; 1 Am. & Eng. Ency. of Law, 78 *et seq;* note to *Com.* v. *Price*, 71 Am. Dec. 671 *et seq; Lumpkin* v. *State*, 68 Ala. 56; *People* v. *Haynes*, 55 Barb. 450; *People* v. *Clough*, 73 Cal. 348.)

The fullest and ablest discussion of the question which has been called to our attention is *Com.* v. *Holmes*, 127 Mass. 424, s. c. 34 Am. Rep. 391, and note; see also *Ross* v. *State*, 74 Ala. 536; *Com.* v. *O'Brien*, 12 Allen 183; *People* v. *Melvane*, 39 Cal. 616; *People* v. *Clough*, 73 Cal. 351; *People* v. *Thompson*, 50 Cal. 40; *People* v. *Barber*, 114 Cal. 619; *People* v. *Everhardt*, 104 N. Y. 592; Headley on Competency and Rights of Witnesses, pp. 54 *et seq; U. S.* v. *Lancaster*, 44 Fed. 896-911.

There was no error in the refusal of the court to give defendant's instructions. (*State* v. *Lawlor*, 28 Minn. 216;

Thompson on Trials, Vol. 1, Sec. 1042; *Mullins* v. *People,* 110 Ill. 42; *State* v. *Fry,* 67 Ia. 475; *State* v. *Kline,* 54 Ia. 183; Thompson on Trials, Vol. 2, Sec. 2437, and cases cited; *May* v. *State,* 22 Tex. App. 595; *People* v. *Miller,* 6 Pac. 99.) Non-direction is not misdirection. Non-direction in any matter is not a ground upon which a new trial may be granted. (Thompson on Trials, Vol. 2, Secs. 2339, 2341, 2346; *Com.* v. *Kneeland,* 20 Pick. 206-222; *Hodge* v. *State,* 8 Ind. 564; *Powers* v. *State,* 87 Ind. 153; *People* v. *Ah Wee,* 48 Cal. 239; *People* v. *Haun,* 44 Cal. 100; *State* v. *McLane,* 15 Nev. 367.) The absence of the defendant during the argument of matters arising before the trial and involving simply law questions is not prejudicial to his rights. (*Epps* v. *State,* 102 Ind. 543; *Luther* v. *State,* 27 Ind. 48; *People* v. *Vail,* 57 How. Prac. 85; *People* v. *Turner,* 39 Cal. 390; Bishop's New Crim. Procedure, Vol. 1, Sec. 269; *Miller* v. *State,* 29 Neb. 440; *People* v. *Galvin,* 9 Cal. 117; *Schwab* v. *Berggren,* 143 U. S. 448; *Fielden* v. *Ills.,* 143 U. S. 455; *Christ* v. *People,* 3 Colo. 395; *Territory* v. *Gay,* 2 Dak. 125; *Boswell* v. *Com.,* 20 Gratt. 860; *People* v. *Ormsby,* 48 Mich. 494; *Com.* v. *Costello,* 121 Mass. 371; *Ex parte Waterman,* 33 Fed. Rep. 29; *State* v. *Taylor,* 89 N. C. 539; *Long* v. *State,* 52 Miss. 23; *Jewell* v. *Com.* 22 Pa. 94-101.)

BRANTLY, C. J.—The defendant was convicted of murder in the first degree, in the District Court of the Seventh Judicial District, in and for Custer county, on November 9, 1897. On the 22d day of November, he was sentenced to be hanged. From this judgment of conviction, and from an order overruling his motion for a new trial, he has appealed to this Court. We notice the assignments of error somewhat in the order in which they are made. The statement of facts appears in the opinion.

1. At the arraignment, the defendant made a motion to set aside the information, on the two grounds: That he had not been legally, or at all, committed by a magistrate; and that the information does not show that the County Attorney

obtained leave to file an information charging defendant with murder in the first degree.

As a matter of law, a defendant is not entitled to be committed by a magistrate before he is informed against. This may be done by leave of court. (Const. Art. III, Sec. 8.) He may also be prosecuted by indictment by a grand jury. Either mode is lawful. . Nor must the information show on its face that it was filed by leave of court. Even if this were true, the objection will not avail in this case, for the information itself shows that leave of court for that purpose was asked in writing and granted before the information was filed. The record independently of this shows that leave was asked in writing and granted. The affidavit filed in support of this motion merely alleges that the defendant had not been examined by a committing magistrate. This is not a ground upon which an information may be set aside, after leave has been obtained to file it. It appears that the defendant was first arrested upon a warrant issued by a magistrate. This proceeding was abandoned. The contention is made that this is ground for setting aside the information. No defendant, however, has a vested right to be prosecuted by any particular method. All he can claim is that he have a fair trial by one of the modes provided by law.

The affidavit and petition for leave to file the information states the name of the deceased as ''William Hoover.'' His name was John Hoover. It is, therefore, insisted by counsel for defendant that this variance in the name vitiates the leave granted. This matter was not presented to the court below. Even if it had been, we are not prepared to say that it would have been error to disregard it. We do not understand that an application for leave to file an information must conform strictly to the technical rules of pleading.

2. Counsel for defendant insist that the information does not state facts sufficient to show that the court had jurisdiction. After stating facts sufficient to charge the defendant with murder, it contains the following allegations: ''That all the defendants are Cheyenne Indians, and that the said Hoover

was a white man, and was, at the time and place of the murder, within the county of Custer, and not within the limits of any Indian reservation.'' Defendant claims that this is a necessary allegation, but, inasmuch as there is within Custer county the Fort Keogh Military Reservation, the information should also show that the crime was not committed there.

The information is in conformity with the statute. The District Court has general jurisdiction of all felonies committed within the limits of the county where it sits. The allegation quoted *supra* is surplusage. If the defendant should be charged with a crime committed out of the court's jurisdiction, this is a matter to be taken advantage of at the trial. The authorities cited by counsel in the brief have reference to courts of limited jurisdiction, and have no application. This question was presented by demurrer. The court overruled the demurrer. We think this correct.

3. The contention is made in this Court, for the first time in this case, that Indians maintaining tribal relations, and occupying a reservation within the State, are not subject to the jurisdiction of State courts, and triable therein, for crimes committed by them against white men while off the reservation. It appears from the proof that the Cheyenne Indians sustain tribal relations, and occupy a reservation in charge of an agent of the Federal Government. It also appears that the killing of Hoover was done without the limits of the reservation. This contention cannot be maintained either upon reason or authority. Where crimes are committed by whites against Indians, or by Indians against whites, outside of a reservation situated within a state, the jurisdiction is in the State courts. (Am. and Eng. Ency. Law, Vol. 10, 443, and authorities cited.) In support of this summary, among other cases, is cited *U. S.* v. *Sa-Coo-Da-Cot, alias Yellow Sun,* 1 Dill. (U. S.) 271; s.c., 27 Fed. Cas. 923. After going fully into the whole case, which was one arising in Nebraska, and similar to the one under consideration, the learned judge concludes that the United States Court had no jurisdiction, but that it was in the State courts, because there was no valid

statute of Congress or treaty stipulation to the contrary.   No
act of Congress or treaty stipulation affecting the jurisdiction
of the courts of this State as to such offenses has been called
to our attention, nor have we been able to find any.   (See,
also, *State* v. *Campbell* (Minn.), 21 Lawy. Rep. Ann. 169,
with notes (s. c. 55 N. W. 553.)

4.   During the argument upon the demurrer and the mo-
tion to set aside the information, the defendant was not pres-
ent in court.   Also, on one day during the trial at the con-
vening of the court after the noon recess, and while a witness
for the State was on the stand, the County Attorney put one
question to the witness before the defendant appeared in court.
This question was not answered, the court having stopped the
proceedings until the defendant was brought in.   Thereupon
the jury was called and the examination of the witness re-
sumed.   As a matter of fact, so far as concerns the trial after
the issues were made up, no testimony was taken, nor any
other step, during the absence of the defendant.   As to this
feature of the proceedings in the court below, the defendant
has suffered no prejudice; he, therefore, has no right to com-
plain.   Touching the absence of the defendant from the court
room during the progress of the argument upon the demurrer
and the motion to set aside the information, we think that this
was in no sense of the word absence from court during trial.
The word "trial," when used in connection with criminal pro-
ceedings, means proceedings in open court, after the pleadings
are finished and it is otherwise ready, down to and including
the rendition of the verdict.   It includes all those steps in the
trial during which the defendant may be of assistance to his
counsel in conducting the proceedings.   It does not include
the preliminary steps wherein the court is passing upon ques-
tions of law and preliminary motions, with a view of settling
the issues.   (3 Am. and Eng. Ency. Law, 735, and note, 2nd
Edition, Vol. 6, 995.)   It is true, the defendant must be
present at the time of his arraignment in felony cases; but we
apprehend this is for the purpose of informing the court that
the plea interposed by him is his own personal plea.   In this

case he was present and entered his plea in person, by the aid of an interpreter.

5.   Before the trial was begun in the court below, the defendant asked the court for an order changing the place of trial, on two grounds, to wit:   First, that he believed that the people of the County of Custer, State of Montana, were so prejudiced against him, and against all the members of his tribe, that he could not have a fair and impartial trial in that county; second, that he believed that it would be impossible to obtain jurors in the County of Custer who had not formed an opinion as to the guilt or innocence of the defendant, such as would disqualify them for the trial of his cause.   This motion was based upon the affidavit of the defendant, with a number of clippings from newspapers, including the Stock Growers' Journal, the Yellowstone Journal, weekly and daily, both published in Miles City, and from the Forsyth Times, published in Forsyth, Custer county.   These clippings are referred to in defendant's affidavit, which, omitting immaterial parts, is as follows:   "That at the time the body of Hoover, the sheepherder, was found, the citizens of this county were greatly alarmed and excited; that the excitement was not local, but extended to every part of the county, and even to other counties; that cowboys and ranchmen to the number of 200 left their homes, and gathered at one of the ranchers residing near the Cheyenne Indian Agency, whose name is not known to deponent; that these men were armed with six-shooters, Winchester rifles and Savage rifles; that the purpose of the gathering was to demand of Capt. George W. H. Stouch, Indian Agent, and of the Indians, the surrender of the murderer of Hoover, they claiming that the murderer of Hoover was a member of the tribe of Cheyenne Indians; and it was their intention, if the alleged murderer of Hoover was not surrendered, to go on the reservation in a body and exterminate the entire tribe of Indians; that, in furtherance of this object, several hundred rounds of cartridges and a great number of Savage rifles were ordered by them from Miles City; that, in addition to this, cartridges and rifles to a great

number were sent to them from other portions of the county, and several hundred rounds of cartridges and a large number of rifles were ordered from eastern cities; that these cowboys and settlers were only persuaded from attacking the Indians by the civil authorities, and the Sheriff of Custer county, to prevent them from carrying out their object, was compelled to leave sworn deputies in charge of them; that this hatred against the Indians arose partially from the fact that the settlers firmly believed that the murder of Hoover was committed by one of the Cheyenne tribe; that this excitement, prejudice and hatred against the Indians was not local, but was felt by the citizens all over the county, and that the same feeling of prejudice and bitterness and hatred is now felt by most of the citizens of this county; that, at or about the time of the burial of the said Hoover, a large number of men, residing near the Agency, vowed or took an oath that they would be present at the trial of the Indians charged with Hoover's murder, and, if they were acquitted, they would take the law in their own hands, and hang the Indians before they left the courthouse yard; that the same threats were repeated at various times subsequent to this, and not only did they threaten to hang the Indians if they were acquitted, but they even went so far as to threaten to hang their counsel and the Honorable Judge of this court; that after the body of Hoover was found, and while the citizens were so alarmed and excited, the United States Government ordered several companies of soldiers from Fort Keogh, Mont., and several companies from Fort Custer, Mont., to go to the Agency, thus adding to the excitement and to the prejudice against the Indians and defendant; that the three papers published in Custer county, namely, the Yellowstone Journal, the Stock Growers' Journal and the Forsyth Times—papers of general circulation—have, since the trouble commenced over the murder of Hoover, published exaggerated accounts of it, and have denounced the Indians as guilty, in severe terms, and that, in consequence thereof, the inhabitants of the county have been unduly excited and prejudiced against the Indians and defendant; that the people of

Miles City, Mont., are greatly prejudiced against the defendant, for that, at the time of the trouble at the Agency over the finding of Hoover's body, about forty families, women and children, came to Miles City from the Agency, and remained there for several weeks, and the stockmen living in Miles City, as well as the stockmen all over the county, that have cattle ranging near or on the reservation, are prejudiced against the Indians, and that they, as well as the other inhabitants of the county, are now, and have been for some time past, desirous that the tribe of Cheyenne Indians should be removed from this county and State; and that this prejudice will prevent those persons summoned as jurors from this county according to defendant a fair and impartial trial; that there was at the time of the finding of Hoover's body, and ever since that time there has been, unfriendly talk against him, and against all the members of his tribe; that the inhabitants of this county hold him in utter contempt; that, subsequent to the finding of Hoover's body, a large number of citizens expressed a desire and a willingness to go and help the settlers to either capture the alleged murderer of Hoover, or exterminate the Cheyenne tribe.''

At the hearing, the court also heard orally the testimony of L. A. Huffman, and John Gibb, the sheriff of Custer county. Huffman's statement is substantially as follows:  ''I am photographer in Miles City, Mont.   At about the time of the discovery of the body of Mr. Hoover, last spring, I was on or near Powder river, east and south of here; I was traveling about with the round-ups, taking photographic views. I traveled over a considerable scope of country.   In some places I found the people excited over the murder of Hoover.   In other places they did not seem to pay much attention to it. With a few exceptions, in the places where I stopped, and about the wagons on the ranges at that time, the conversation led in the direction of the killing of Hoover by the Cheyenne Indians;  there was undoubtedly a strong prejudice in the minds of the people; they seemed to be ready to drop their work and join in some sort of a movement against the Chey-

ennes if further bloodshed should occur; that is as near as I could state the condition of the feeling already existing. I have no knowledge of an oath having been taken by different individuals in that section of the country regarding what they would do in the event that the Indians accused of the crime of killing Hoover were not dealt with at this term of court. It seemed as if the settlers were generally arming themselves with arms and ammunition. I saw a good many arms and much ammunition being forwarded. I think the purpose was to protect themselves individually and the settlers of the country generally against any further uprising of the Indians on account of the killing of Hoover. I could not see any indication of an uprising among the Indians; there was considerable excitement, greater or less, in different parts of the county—greater nearer the scene of the difficulty. In some places the people appeared to pay very little attention to the matter, and did not move their families. I can remember two or three instances of that kind, where they passed the matter over lightly. You could probably go twenty-five miles from there and find a state of excitement existing.''

John Gibb's statement is as follows: ''I am the same Mr. Gibb who made the affidavit just read. The first time I visited the Cheyenne Reservation in relation to the killing of Mr. Hoover, was, I think, on the 26th day of May; I was with Mr. Bateman, the coroner, who went to examine into the cause of the death of Mr. Hoover; and on that same trip we went to Lame Deer. There was lots of excitement among the inhabitants at that time as regards the killing of Hoover; there was a feeling that it was time these murders were stopped, and the murderers punished. I talked with more or less of the persons there with regard to the matter of getting a jury, but I can remember only in a general way the conversations had. I remember of hearing one Lee Tucker speaking about the matter; Tucker wanted to go in there and make a fight. I cannot remember all that he said, but that was the substance of it. He thought that the killing of that man, and the cattle killing, and the general condition of that character that had

obtained there for some time, demanded some speedy and adequate punishment.     There was considerable hostility there over the killing of cattle by the Indians.     I think that this feeling has obtained for a great many years.     I am not prepared to say whether it is a general feeling or not, but the people residing in that neighborhood there are men who have suffered from alleged depredations of the Indians in various manners; they felt that they wanted them out of there.     At the time they were examining the body of Hoover, and gathering the remnants together, there was quite an excitement there, and considerable talk; and I stated that, as sheriff of Custer county, I should demand the enforcement of the law, and should permit no unlawful attempt of any character to go on there.     I left four deputies there at the reservation—one from Otter Creek, one from Tongue River, one from Rosebud, and Mr. Smith, a deputy from Miles City.     The object of leaving these deputies was so that they might keep in touch with their people in the various sections of the country; let them know what was going on at the Agency, and warn them, if need be, of any danger that might come up, that would cause them to leave there.     That was the sole object of leaving the deputies there, and it was so stated publicly there what they were left there for at that time.     I felt that, without some representation of the office, the settlers would absolutely know nothing of what was going on.     The dispatches between the Government employees passed right through by special courier.     The people were in absolute ignorance as to what was transpiring there, and that was my reason for leaving these people there; so that they could warn their people, and warn them if danger was coming on at any time.     Under the conditions laid down by Captain Stouch, my officers were powerless to do anything there in the way of maintaining peace and order and enforcing the law, and could only sit with their hands folded.     Their instructions were to simply await Captain Stouch's action in arresting the murderers; and in the meantime, if they discovered anything that would be of interest to the settlers in the various communities in which they

lived, to notify them.  I am not prepared to state much regarding what excitement there was in other parts of the country, because for five weeks my attention was centered there at the Agency; and I was there most of the time, either there or going and coming from there.''

Specimens·of clippings from various newspapers, including the Stock Growers' Journal, and the Yellowstone Journal of Miles City, and the Forsyth Times of Forsyth, all of general circulation, were introduced and considered as part of the showing in support of this motion.  It is impossible to set forth these at length.  They cover 60 pages of the record. In general, they discuss rather heatedly, the disappearence of Hoover; they charge it to the Indians; they complain bitterly of the depredations alleged to have been committed from time to time by the Indians; they state that the long suffering disposition of the people will not continue indefinitely; they recount the trouble had with the Indians for years, and the probability of the alleged murder of Hoover bringing things to a crisis, so that the Government at Washington will at last be forced to remove the Indians from the State.   They detail the conflict of jurisdiction between the civil and military authorities; the gathering of arms and getting ready of ammunition for trouble with the Indians; the removal of a large number of families to places of safety; the abandonment of round-ups and shearing among stockmen, owing to the fear of Indians; the gathering of armed men; and the correspondence between the Governor of Montana, the county attorney and the authorities at Washington.   In short, editorially and through their correspondents from different points of the county, there are recounted all the various rumors and extravagant statements usual among a people wrought up with excitement.

In opposition to this showing made by the defendant and the testimony of the witnesses examined orally, affidavits were filed by T. J. Porter, the County Attorney, and John Gibb, the Sheriff.   Omitting the opinions of the affiant touching the prevalence of prejudice in the County of Custer, the affidavit of Mr Porter is as follows:

"Affiant states, on information and belief, that it is wholly untrue that any number of men at any place took any vow or oath to be present at the trial or upon the acquittal of this defendant or any Indian, to take the law in their own hands, and hang or in any way injure or harm any Indian, or made any threats against defendant's counsel or the Judge of this court, or any threat whatsoever; or that there exists with the body of the people of this county any prejudice, bitterness, or hatred against this defendant; or that, from this or any cause, the jurors summoned herein will be prevented from according this defendant a fair and impartial trial; or that there is any bias or prejudice existing among the people of this county that will prevent defendant from having a fair and impartial trial of this cause."

John Gibb, after stating that he is the Sheriff of Custer county, and that he has read the affidavit of Spotted Hawk, the defendant, says:

"At the time of investigating the death of Hoover, the undersigned was present near the Cheyenne Indian Reservation, and met and talked with a large number of the residents of that vicinity; but at no time was it necessary to place any deputy in charge of any cowboys or settlers to keep them from attacking the Indians, or for any purpose whatsoever, or that any deputy sheriff was at any time placed in charge of any cowboys or settlers, and that the affidavit of said Spotted Hawk as to the actions of the Sheriff in such matter is wholly untrue."

This constitutes the showing made at the time of the application. It has been repeatedly held by this Court that an application for a change of the place of trial is addressed to the sound discretion of the court, and that the action of the trial court thereon will not be disturbed, unless it appears that there has been an abuse of this power. (*Territory* v. *Manton*, 8 Mont. 95, 19 Pac. 387; *Kennon* v. *Gilmer*, 5 Mont. 257, 5 Pac. 847; *in re Davis' Estate*, 11 Mont. 1, 27 Pac. 342; *Territory* v. *Corbett*, 3 Mont. 50.) It is also the rule that the application must set forth the facts upon which it is

based, and not the mere opinion of the affiants or witnesses who are sworn in support of it. (See the authorities last above cited; also, the following: *People* v. *Yoakum,* 53 Cal. 566; *People* v. *Congleton,* 44 Cal. 92; *People* v. *Shuler,* 28 Cal. 490; *People* v. *McCauley,* 1 Cal. 379.)

It is also the rule that every application of this kind must be determined upon the facts and circumstances presented by it. No general rule can be laid down. The lower court denied the motion, for the reason that the affidavits and proof were insufficient, under the rule announced in the case of *Territory* v. *Manton, supra.* Examining the the affidavits supporting the motion in *Territory* v. *Manton,* they are substantially to the effect that "the affiants have heard the case frequently discussed in their respective neighborhoods, and, from what they have heard, they do not believe the defendant can have a fair and impartial trial in the county, for the reason that the inhabitants of said county are prejudiced against said Manton." Of the same character are the affidavits in the other cases cited. In such an affidavit no fact is stated from which the court could form a conclusion. It merely sets forth the opinion of the witness. The court acting upon it would act, not upon a conclusion of its own, but upon the conclusion of another. Can this be said of the application here? The defendant here, in the most direct and positive language, not upon information and belief, enumerates a number of facts and circumstances tending to show that he could not get a fair trial in Custer county, to wit: That the people were greatly excited in all parts of the county; that cowboys and ranchmen to the number of 200 had left their homes and gathered at a ranch near the Cheyenne Indian Agency; that these men were armed; that they had gathered together to force the Indian Agent to surrender the murderer of Hoover, claiming that the murderer was a member of this tribe; that it was their intention, if the murderer was not surrendered, to go upon the reservation and exterminate the tribe; that they, in furtherance of this object, gathered ammunition and rifles from Miles City and eastern cities; that cartridges

and rifles were sent to them from other parts of the county; that they were only persuaded from attacking the Indians by the civil authorities of the county; that the Sheriff was compelled to leave deputies in charge of them to restrain them; that this condition arose from the fact that the people believed that the Cheyenne Indians killed Hoover; that bitterness against the Indians extended to all parts of the county, and existed at the time of the trial; that, at the time of the burial of Hoover, a large number of men took an oath that they would be present at the trial of Hoover's murderers, and, if they were acquitted, they would take the law in their own hands, and not allow them to leave the court room; that they would be avenged upon the court and counsel in case of acquittal; and that the excitement was so great that the military authorities sent several companies of soldiers to prevent an outbreak. It further recites that the papers in Custer county, all of general circulation, denounced the Indians, unduly exciting the inhabitants and prejudicing them against the Indians, including the defendant; that about 40 families removed from the Agency to Miles City to get protection from the threatened danger, and remained there several weeks; and that, since the finding of the body of Hoover, there had been unfriendly talk against him, the people of Custer county holding him in utter contempt. In many respects these statements are strongly corroborated by the evidence of Huffman and Gibb, set out above; and there is nothing to contradict them except the affidavit of the County Attorney, Porter, made upon information and belief, and that of Sheriff Gibb. The former specifically denies only one fact, even upon information and belief. It denies that any number of men took any vow or oath to be present at the trial and take the law into their own hands; or threatened to hang or do any injury to the court or counsel of the defendant. Sheriff Gibb states that it was never at any time necessary to put any cowboys or settlers in charge of deputies to keep them from attacking the Indians. Huffman found excitement in almost all parts of the county he visited. The people were talking of the murder and the

Indian excitement wherever he stopped, with a few exceptions. There was strong prejudice in the minds of the people, and they were ready to stop work and go upon a movement against the Cheyennes if further trouble occurred. The settlers were generally arming themselves and getting ammunition. He saw arms and ammunition forwarded. Gibb found excitement near the Agency. One man wanted to go and fight the Indians, because he thought the killing of Hoover and the stealing of cattle should be more speedily and adequately punished. This statement was made to him while the discussion of the possibility of getting a jury was had. While he says that he put no cowboys or settlers in charge of deputies, he does make it clear that he deemed the matter of so much importance, and the danger to the people so imminent from a threatened outbreak of the Indians, that he put near the Agency four deputies from different parts of the county, with the purpose that they might warn the people of their particular localities of any coming danger. He himself spent five weeks' time either at the Agency, or in going to or returning therefrom, in his attempt to secure the arrest of the Indians charged with the murder, and in looking out that the inhabitants were informed of any threatened danger. The newspaper clippings introduced at the hearing are of no value whatever as evidence of the facts and statements set forth in them; but, mindful of the hereditary enmity and antipathy existing between the whites and the Indians wherever they have lived in proximity with each other in this western country; mindful, also, of the fact, which is a matter of history, that there have during recent years been troubles between the whites and the Indians in various parts of the country—the fact that these publications were made during a period of five weeks, extravagant and inflammatory in their character, would lead one to believe that the readers of them would be more or less excited by the statements contained in them. It is abundantly apparent, also, that an outbreak of hostilities between the whites and Indians was threatened at this time over the murder of Hoover.

We think that, upon the whole showing, whatever opinion might be entertained regarding the sources of information of the defendant upon which he bases his statements in his affidavit, sufficient appears therefrom to impel this Court to the conclusion that the lower court should have granted the defendant's petition. If these statements of the defendant were not true, it could easily have been shown that they were not. They are not seriously controverted. (For a very full and satisfactory discussion of a similar case, see *State* v. *Crafton*, 89 Iowa, 109, 56 N. W. 257.)

The fact that a jury was obtained in Custer county, that answered all the statutory requirements, after an examination of 65 veniremen only, is not at all conclusive upon the question of the existence of such a prejudice in the community as to render a fair and impartial trial impossible. "This is not the test to be applied to the question, for such a jury might be found when the public sentiment was in a blaze of excitement and passion against one of the parties to the action; and the pressure of this public sentiment might make itself felt during the trial, in very many ways, upon the jury, upon the witnesses and officers of court, and upon the court itself. Jurors, witnesses and officers cannot be insensible to a strong and excited public feeling and sentiment concerning the trial that is going on, and are liable to be influenced by it, unconsciously, and with an honest intention of doing their whole duty. The court room is a public place, and a trial, in which a community is deeply interested, brings the people there; and the pressure of their presence and feeling is a strong argument, and almost irresistible, one way or the other. The influence of their presence, and the expression of their interest in the event of the trial, in divers ways, might give a false coloring to the testimony, or warp and bias the judgment in weighing and considering it." (*Kennon* v. *Gilmer*, 5 Mont., at page 264, 5 Pac. 850.)

The refusal to grant this application of the defendant we deem to be such an abuse of discretion on the part of the trial court, that this cause should be reversed, and a new trial granted, on this ground alone.

6.   Counsel for defendant insists that the conviction was had
in this cause upon the uncorroborated testimony of an accom-
plice.   It is admitted that the witness Whirlwind was an ac-
complice.   In this connection our attention is called to Section
2089 of the Penal Code, which reads as follows:

"A conviction cannot be had on the testimony of an accom-
plice, unless he is corroborated by other evidence, which in
itself, and without the aid of the testimony of the accomplice,
tends to connect the defendant with the commission of the
offense; and the corroboration is not sufficient, if it merely
shows the commission of the offense, or the circumstances
thereof."

The construction put by this Court upon this section will be
found in the case of *State* v. *Geddes,* in which the opinion was
handed down at the present term.   (*Post* p. 68, 55 Pac. 919.)
For a full discussion of the authorities and the conclusions of
the Court thereon, reference is made to that case.   Applying the
rule there laid down to the facts of this case, let us look into
the testimony as presented by the accomplice and the corrob-
orating evidence.   The witness Whirlwind tells the story of
the murder in the following words:

"I know where the Indian named Calf lives.   My wife and
I visited there last spring.   Red Bird came there, and meas-
ured the plowed ground while we were there.   Spotted Hawk
used to visit us there.   One morning Spotted Hawk came
there on horseback.   He had a carbine—a soldier's gun.   He
asked me to go along, and go out riding or roaming around.
I assented, and then went for my horse.   I got a sorrel horse,
belonging to my wife.   We then started.   The gun I had be-
longed to White Moon.   Spotted Hawk and I both had belts
with cartridges; they were all soldiers' cartridges, those in
my belt; that is, 45-70's—the kind soldiers use.   A boy named
Shoulder Blade helped me to get my horse; he did not have a
gun.   After we got saddled up, all three of us went down to
Little Whirlwind's house, and asked him to go along.   He
went for a horse and brought a buckskin, a sorrel horse.
After he had saddled up his horse, he got his gun and some

cartridges; it was a Winchester gun. He had little cartridges.
There is other ammunition for the big guns, but the gun he
had shot this little kind.    Shoulder Blade was riding a sorrel
horse, and Spotted Hawk had an American horse; that is, a
white man's horse.   As soon as Little Whirlwind got his gun
and saddled his horse, we started.   It was in the middle of
the forenoon.   We followed the road that comes down Tongue
river.   We went down as far as Fire Crow's tepee.   There is
a road there that runs off into the hills, and we took that road.
We did not find anything to shoot at before we came to Fire
Crow's house.   I do not remember what we talked about as
we rode along.   I could not tell the name of the ground that
we went over, but after we left the road we went up.   The
first thing we found to shoot was a bunch of five cows.   The
first shot was fired by Little Whirlwind; he shot and killed a
two-year-old cow; it was sorrel in color.   The boy Shoulder
Blade came up into the hills with us, but was off a little ways
when the cow was shot.   When the cow was shot, we all got
off our horses and started to skin it; that is, cutting down the
legs and getting ready to take the hide off.   Our guns were
laid on the ground, a little ways off from the cow.   We held
our horses by ropes.   Shoulder Blade was a little way off,
where we could see him.   Only one shot was fired.   At this
time a white man came up close.   He hollered, and we all saw
him, and then got on our horses.   The white man went away.
He did not say anything.   When the white man hollered,
Shoulder Blade run off.   He was on horseback.   I did not see
the boy any more until I came back to the tepee.   When we
got on our horses, we took our guns.   We said nothing, but
followed him, the white man, keeping off quite a ways.   The
white man went back to where his sheep were.   While we
were at this cow we said, 'This white man has seen us, and he
will know us.'   This is all that was said.   'This man will
know us, for he is close on to us.'   We said this to each other.
We said that he would go and tell on us, for he knew us.   As
we followed him on our horses, we stayed back a little way.
When he got back to his sheep, we went up close on him.

We made a charge on him; that is, Spotted Hawk, Little Whirlwind and myself. As we charged, we all three shot at him. He fell. When the man fell, Spotted Hawk shot him. He shot him again, and he was close on to him. Spotted Hawk was on his horse when he shot. The shot struck him about there (indicating the left breast). There was a little dog roaming around there, and we all said, 'This dog will go down there, and they will know it up there;' and so Little Whirlwind shot it with the Winchester, and put him by the man, where the white man was lying. Little Whirlwind got off from his horse, but Spotted Hawk and I remained on our horses. We then run away. We all went home together, and went along to our different tepees. It was nearly sundown when we got back. When I got to Calf's tepee, the boy Shoulder Blade was there. It was about three days after this that I stopped visiting at Calf's tepee, and went away. This white man was short. I had never seen him before. The white man did not see us when we were following him, or when we charged on him. After the white man was shot first, he started to get up. When Spotted Hawk shot the man, he had in his hand the same gun as he had when we started in the morning. It was a soldier's gun—a carbine—and the ammunition was soldier's ammunition. It was early in the spring when Spotted Hawk came to my house. If I could talk English, I would know the month of the year. The Cheyennes have different kinds of names for the months from the white men. I do not know the name of the month in which Spotted Hawk came to Calf's tepee. It was in nice weather, and the trees were just budding out. I have no tepee or ground on Otter creek, nor have I a plow or team of horses. At the time Spotted Hawk came to my tepee, and wanted me to go riding with him, the people were plowing. The Indians on Tongue river were plowing several days; there were lots of bucks plowing there—all over there around the mission. I could not tell all of them if I were to count them. Spotted Hawk was one, Walking Horse, Calf, Two Bulls, Badger, Twin, Wolf, Chubby, Little Whirlwind, Sam Crow, Medicine

Bow and myself.‘ I was with the plowing gang. I do not belong to Red Bird's plowing gang; I just went over there. Two Bulls was the boss of the plowing gang. The white man had not gone very far from where we killed the beef before we overtook him. The country was hilly around there. The white man was looking at us when we charged on him. He did not run, and said nothing; just stood there, and let us shoot him. We did not sneak up behind him, and shoot him. He was not sitting down. When the dog was killed, it was laid close up by the side of the body. I did not visit the body again after the killing.''

This is all of the testimony of the witness Whirlwind touching the facts and circumstances of the killing. The testimony of witness Shoulder Blade agrees, substantially, with that of Whirlwind up to the time of killing the cow. He says that the party, including himself, Whirlwind, Little Whirlwind and Spotted Hawk, the defendant, were out riding together, or roaming around. The defendant was riding an American horse; the Indians were riding their own horses. All the party, except himself, were armed and had cartridge belts. All the incidents of the killing of the cow he details. The appearance of the white man interrupted their proceedings, and his running away after the rest mounted their horses and the white man disappeared, is recounted. He left the rest of the party behind, and did not see anything of them until near sundown of that day, when Whirlwind returned to Calf's tepee. Calf is the father of Shoulder Blade. After the arrest, and while the defendant Spotted Hawk was being brought to Miles City from the Agency, in company with the witness Shoulder Blade, Spotted Hawk urged him ''not to tell it'' (pointing in a direction not disclosed.)

The time of the killing is fixed by the testimony of witness Fred. Barringer, at from the 28th of April to the 3d day of May, 1897. By the testimony of Red Bird, Capt. Stouch and others, the defendant was at the Tongue River Mission, where the plowing camps were, from the 25th of April until about the 2d day of May. In the evening of the 27th day of

April, Fred. Barringer, one of the witnesses for the State, left John Hoover, the deceased, at the Barringer sheep camp, in charge of witness Barringer's sheep. Barringer's ranch is on Tongue river, about 65 miles south of Miles City. The sheep camp was situated about two miles and a half from the home ranch, in a southwesterly direction. On May 3d a part of the sheep strayed back from the camp to the home ranch, and this led to a search by Barringer for Hoover. Hoover was last seen by any white witness on the evening of the 27th of April. The body was found on the evening of May 27th, on a low divide, about three-fourths of a mile from his sheep camp. Nothing was left of it but the bones, with some flesh on the hands, the hair and clothing. The body was fully identified. The body of the dog was lying close up to the left side of the deceased. The dog was also identified. Three empty cartridge shells were found a few feet away from the body, having the appearance of having lain on the ground for some time. They were of the same calibre as the guns carried by the defendant and his companions, according to the testimony of Whirlwind. In the direction these lay from the body, the tracks of three horses were found leading away from the body, one larger than the others. Two bullet marks were found upon the body—one on the left arm, the bone of which was broken, and the other through the body from the left breast, straight through one of the spinal vertebræ. The woolen shirt worn by the deceased at his death was found burned where the ball had entered the breast. Under the body in the ground, the ball was found, and this fitted the shells picked up near by. The deceased was a short man about 4½ feet high, this shortness of stature being due to a deformity in his back.

Shoulder Blade was not an accomplice in the murder and therefore his testimony is to be considered as independent testimony. The different items of this proof are: The larceny of the cow; the discovery of the defendant and his companions by a white man while in the act of committing the larceny; the defendant last seen in company with Whirlwind and Lit-

tle Whirlwind near where the white man was; the fact that
this was at or about the time Hoover disappeared; the fact
that the defendant and companions were armed with guns,
and were riding horses; a white man found dead about four
weeks after this, on the range, apparently murdered by some
person or persons, by shots in the left arm and breast; that
the range was somewhere along Tongue river, about 65 miles
from Miles City; that the man found murdered was John
Hoover, the herder of Barringer; that there were found near
the body three empty shells, and the tracks of three
horses leading away in the direction in which the shells
lay; that the dog was found near the left side of the
body of Hoover; that the shirt on the body was burned, ap-
parently by the shot; and the fact that the defendant asked
Shoulder Blade "not to tell. it," pointing in a direction not
disclosed. The question is whether, laying aside the testi-
mony of the accomplice, these facts tend in themselves, and
without his testimony, to connect the defendant with the mur-
der of Hoover. We hold that they do not, further than to
raise a strong suspicion against him. There is no independent
proof of any kind in the record identifying the white man
seen by Shoulder Blade as Hoover. The murder was com-
mitted somewhere in the hills along Tongue river, about
three miles from Barringer's ranch, in Section 5, Township 2
S. of Range 44 E. The defendant and his companions lived
somewhere near the Mission on Tongue river, but the dis-
tance from Barringer's to these places is not given. The
tepees of Little Whirlwhind, Fire Crow, Calf, and the de-
fendant are mentioned in connection with the events of the
day on which the defendant was caught in the larceny, but
their location, relative to each other and Barringer's and the
sheep camp, are not given. In fact, the geography of the
country, and the distances and direction of the places named
from each other are almost entirely omitted. The country
where the murder occurred is a stock country, of wide ex-
tent. Presumably there were other sheep herders in it. The
defendant and his companions might have been discovered by

another herder, miles away from the scene of the murder of
Hoover.    There is no evidence upon this subject.    There is
none to bring the defendant in proximity to the sheep herder's
camp of Barringer without the testimony of Whirlwind.
There is no map or diagram from which any of these facts
can be inferred.    So far as this feature of the proof goes it
fails entirely to aid, independently, in connecting the defend-
ant personally with the crime.    Nor does the request of the
defendant of Shoulder Blade that he should "not tell it" sup-
ply the connection, because it does not appear that Shoulder
Blade knew anything of the killing.    It is true that, after
reading the testimony of the accomplice, we naturally enter-
tain a strong suspicion that he was implicated in the crime;
but under the rule laid down in *State* v. *Geddes, supra,* this
is not sufficient.

In this connection we would advise the parties in cases like
this to follow the suggestions made by this Court in *Wood* v.
*Lowney,* 20 Mont. 273, 50 Pac. 794, as to the use of maps
and diagrams.    The use of them in this case would doubtless
have remedied the defect in the proof just mentioned.    It cer-
tainly would have lightened the labors of this Court in the
case at bar.

The foregoing discussion also disposes of the contention by
counsel that the evidence is not sufficient to sustain the ver-
dict, and it is therefore not necessary to examine the evidence
further.

A great many other errors are assigned in the record, but
it is not necessary to notice them all.    We shall notice briefly
such of them as will be of aid to the lower court at another
trial.

7.    On the cross examination of the witness Whirlwind,
counsel for defendant asked him if he had not had a conversa-
tion with Spotted Elk at the Agency, in which he had stated
to Spotted Elk that he (Whirlwind) alone had killed the white
man, giving the particulars in full.    He denied having had
such a conversation.    Spotted Elk was examined on
behalf of the defendant, and asked about this con-

versation. The inquiry was disallowed, on the ground that no foundation had been laid for it. The attention of Whirlwind had been called to the conversation, strictly under the requirements of Section 3380, Code of Civil Procedure. It is apparent that the attention of counsel was to impeach the testimony of Whirlwind, and it was proper that he should do so. The question should have been allowed.

8. On cross examination, Whirlwind was asked this question: "Were you not discharged from the army for the reason that you were periodically insane and generally imbecile?" On objection by the counsel for the State it was disallowed as incompetent. Afterwards the defense offered in evidence a certified copy from the War Department in Washington of Whirlwind's discharge from the army, of date of July 10, 1893. This paper contained a recital of the reasons for his discharge, setting forth that he was deficient in intellect, had no appreciation of moral responsibility, was in the infantile stage and had undeveloped reasoning powers. Upon objection by the State, this was also excluded. To both these rulings exception is taken. This action of the court was correct. The question put to the witness is so shaped as to bring out an answer showing the estimate in which the witness was held by others, and not the fact as to his mental condition then or at any other time. It might have been competent to show his real mental condition, with a view of testing his credibility; but it was not competent to prove by him what others thought. Nor was the certificate competent. It is a mere *ex parte* statement by a person not shown to be qualified to speak as to the mental condition of the witness. It was also an attempt to impeach the witness on a collateral matter.

Many of the witnesses in the trial had to be examined by the aid of an interpreter. Often in the examination of these witnesses, leading questions were allowed on the part of the County Attorney. Upon examination of the same character of witnesses by the defense, this mode of examination was dis-

allowed. Upon what theory this was done we are unable to see. It was certainly within the sound discretion of the court to allow to the State this mode of examination, especially when the witnesses were illiterate and unable to speak English (Code of Civil Procedure, Section 3374); but, having done this, it would have been but fair to extend the same privilege to the defendant.

9. The defendant requested the court to give the following instruction, which was refused: "The jury are instructed that in this case the witness Whirlwind (alias David Stanley) is what is known in law as an 'accomplice;' and as to the testimony of an accomplice, or one jointly charged with the defendant on trial with the commission of the offense, you should always act upon such testimony with great care and caution, and subject it to careful examination in the light of all the other evidence in the case, and the jury ought not to convict upon such testimony unless, after a careful examination of such testimony, they are satisfied beyond a reasonable doubt of its truth, and that they can safely rely upon it."

The court in this case might very well have assumed that Whirlwind was an accomplice, and cautioned the jury that his testimony should be distrusted. (Code of Civil Procedure, Sec. 3390.) It was admitted that Whirlwind was an accomplice. But this instruction assumes that one jointly charged with the defendant is an accomplice, and directs the jury to test his evidence by the rules applicable to the testimony of an accomplice. An accomplice is one who is guilty of complicity in the crime charged, either by being present and aiding or abetting in it, or by having advised and encouraged it, though absent from the place at which it is committed. (Penal Code, Sec. 41.) The instruction was therefore properly refused.

The following was also requested and refused: "The jury are instructed that one accomplice cannot corroborate the testimony of another accomplice." This was requested upon the assumption that Shoulder Blade was an accomplice in the murder. There is no testimony tending to show that he was.

True, he was jointly charged with the defendant, but this fact is no proof of complicity. Under this condition of things, though the instruction is a correct statement of the law (*People* v. *Creegan* (Cal.) 53 Pac. 1082), it was not error to refuse it. It could not aid the jury in any way.

It is insisted that the court erred in refusing the following instruction: "The jury are instructed that, while the prosecution must establish beyond a reasonable doubt the guilt of the defendant, it is not incumbent upon the defendant to prove an alibi beyond a reasonable doubt. Though the evidence offered to establish an alibi falls short of the weight of moral certainty as to the existence of the alibi, yet if it leave in the minds of the jury such a doubt or uncertainty that, taken by itself, they could not find for or against the alibi, they are bound to carry such doubt into the case of the prosecution, and to array it there as an element of the reasonable doubt beyond which the prosecution must establish guilt. The defendant is entitled as much to the benefit of such doubt as to any other doubt raised by the evidence; and if the weight alone, or added to that of any other, be sufficient to reduce belief in their minds as to the defendant's guilt to a reasonable doubt, they must acquit."

In this connection the court, in the general charge, instructed the jury as follows: "The jury are instructed that one of the defenses made by the defendant in this case is what is known as an alibi; that is, that the defendant was in another place at the time of the commission of the crime. This is a proper defense, if proven; and if, in view of all of the evidence of the case, the jury have a reasonable doubt as to the presence of the defendant at the time and place where the crime was committed, they should give the defendant the benefit of the doubt, and find him not guilty."

The contention is made that the instruction requested should have been given, and that the general charge of the court is erroneous in the use of the word "proven." While the burden of establishing an alibi beyond a reasonable doubt, or even by a preponderance of the evidence, does not rest upon the

defendant (2 Thompson on Trials, Sec. 2435), the burden certainly does rest upon him to furnish the proof tending to establish it (*Id.*)  Therefore, taking the instruction given by the court as a whole, it is correct, and covers the whole ground.  It expressly leaves the question of reasonable doubt for the jury to determine, upon all the evidence, and the use of the word "proven" does not cast any other burden upon the defendant than that he should furnish some proof tending to establish the defense upon which he relies.  It was therefore not error to refuse the instruction requested, though, under the rule laid down by Thompson, *supra*, it is a correct statement of the law.

10.  After the case was submitted, the jury returned into court, and requested additional instructions upon the words "deliberation," "premeditation," or "preconceived design," used by the court in defining the distinction between murder in the first and second degrees.  The court thereupon gave the following instruction:  "The jury are instructed that 'conceive,' as used in these instructions, means to think of; 'preconceive' means to think of beforehand—that is, before the execution of the act thought of; therefore, 'preconceived,' as used in these instructions, means 'premeditation;' and 'premeditation' is thought beforehand for any length of time, however short.  'Deliberation' does not mean brooded over, considered, reflected upon for a week, or day, or an hour, but it means the intent to kill, executed by the party not under the influence of a violent passion suddenly aroused, amounting to a temporary dethronement of the reason, but in the furtherance of a formed design to gratify a feeling of revenge, or to accomplish some other unlawful purpose; that is, it means in a cool state of blood, and is usually characterized by what are ordinarily termed 'cold-blooded murders,' such as proceed from deep malignity of heart, and are prompted by motives of revenge or gain."  Counsel insists that this is error.  While this instruction is not as artificially drawn as it might have been, still it is a substantially correct statement of the law. (2 Thompson on Trials, Sec. 2209.)

It is not necessary to extend this discussion.    The judgment herein is reversed, and the cause remanded, with directions to grant the defendant a new trial.

*Reversed and remanded.*

Hunt and Pigott, JJ., concur.

